IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
FOURTEENTH DIVISION

ANGELA MOODY

VS.                                                                    PLAINTIFF

                                    NO. 60DR-2011-1586

EDWARD MOODY

                                                                       DEFENDANT

---

VIDEO EVIDENTIARY DEPOSITION OF DR. JAMES R. FLENS
OCTOBER 8, 2014

---

APPEARANCES

**ON BEHALF OF THE DEFENDANT:**

Ms. Diana Friedman
Attorney at Law
3710 Rawlins Street, Suite 1230
Dallas, TX  75219

**ON BEHALF OF THE PLAINTIFF:**

Mr. Jeff Mitchell
TAYLOR LAW PARTNERS, LLP
303 Millsap Road
Fayetteville, AR 72703

**ALSO PRESENT:**

Mrs. Adrienne Griffis, Co-Counsel for Defendant
Mrs. Angela Moody, Plaintiff
Mr. Edward Moody, Defendant

MELANIE MILLER, CCR
(501) 590-6455

2

# I N D E X

CAPTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . 2

STIPULATIONS . . . . . . . . . . . . . . . . . . . . . . . 3

PROCEEDINGS - WITNESS:  Dr. James R. Flens

    Direct Examination by Ms. Friedman. . . . . . . . . . 4

    Cross-Examination by Mr. Mitchell . . . . . . . . . . 18

    Re-Direct Examination by Ms. Friedman . . . . . . . . 41

DEPOSITION CONCLUDED . . . . . . . . . . . . . . . . . . . 49

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . . 50

EXHIBITS                                          IDENTIFIED

    EXHIBIT NO. 1 . . . . . . . . . . . . . . . . . . . . 5

    EXHIBIT NO. 2 . . . . . . . . . . . . . . . . . . . . 9

    EXHIBIT NO. 3 . . . . . . . . . . . . . . . . . . . . 42

**STIPULATIONS**

The deposition of Dr. James R. Flens, produced, sworn and examined in the law offices of Dodds, Kidd & Ryan, 313 West Second, Little Rock Arkansas, commencing at 9:56 a.m. on October 8, 2014, in the above captioned cause at the instance of counsel for the Defendant, said deposition being taken according to the terms and provisions of the Rules of Civil Procedure.

It is stipulated and agreed by the parties, through their attorneys of record, that all forms and formalities in the taking, transcribing, forwarding and filing of said deposition are hereby waived, however, the right being expressly reserved to object to the testimony of the witnesses at the time of trial as to incompetency, irrelevancy and immateriality, other than those with respect to the form of questions as propounded to the witness.

4

1   VIDEOGRAPHER:  We're on the audio/video record

2   at approximately 9:58 a.m. on October 17th(sic),

3   2014.  This is Mike Tschiemer, audio/video specialist

4   from Arkansas Legal Video.  We're at Dodds, Kidd,

5   Ryan at 313 West Second Street in Little Rock,

6   Arkansas to take the deposition of Dr. James Flens in

7   the matter of Angela Moody versus Edward Moody, in

8   the Circuit Court of Pulaski County, Case No. DR

9   2011-1586.  Will counsel please state their

10   appearances for the record?

11   MS. FRIEDMAN:  Diana Friedman for Ed Moody.

12   MRS. GRIFFIS:  Adrienne Griffis for Ed Moody.

13   MR. MITCHELL:  Jeff Mitchell for Angela Moody.

14   VIDEOGRAPHER:  Will the court reporter please

15   swear the witness?

16   COURT REPORTER:  Raise your right hand.  Do you

17   solemnly swear or affirm that the testimony you're

18   about to give will be the truth, the whole truth and

19   nothing but the truth so help you God?

20   WITNESS:  I do.

21   COURT REPORTER:  Thank you.

22   VIDEOGRAPHER:  Thank you.  Please proceed.

23                    **PROCEEDINGS**

24   **WHEREUPON**, Dr. James R. Flens, having been duly sworn

25   to tell the truth, the whole truth and nothing but the truth

1   and gave the following testimony to wit:                              5

2                   DIRECT EXAMINATION

3   MS. FRIEDMAN:

4   Q    Dr. Flens, would you please state your full name for the

5   Court and record?

6   A    Dr. James R. Flens.

7   Q    And how are you employed?

8   A    I am a -- in private practice as a Forensic Clinical

9   Psychologist.

10  Q    And where do you office?

11  A    Down in the Tampa Bay area, a town called Valrico,

12  Florida.

13  Q    And what licenses do you hold?

14  A    I am licensed in Florida as a Psychologist.  I am, also, a

15  instrument rated pilot.

16  Q    Do you have an area of expertise within your area of

17  Psychology?

18  A    Yes, I do.

19  Q    Will you tell the Court what that is?

20  A    I am specialized in child custody evaluation.  And within

21  that, I also sub-specialize in psychological testing as it's

22  used in the child custody arena.

23  Q    I'm going to hand you what's been marked as Exhibit One

24  and ask if you can identify it as your Curriculum Vitae?

25               (WHEREUPON, Exhibit No. 1 was marked for

6

1          identification purposes.)

2   **WITNESS:**

3   A    Let me make sure it is.  Yes, it is.  It's not my current

4   one.  My current one is, actually, dated July 26, 2014.  I can

5   probably, quickly tell you the changes --

6   Q    Okay.

7   A    -- that have been made.

8   Q    If you would, please.

9   A    There is one publication addition.  It's in Press, in the

10  Matrimonial Strategist, David Martindale and myself are the

11  authors.  It's called Collaborative Work Product Reviews, a

12  Concept in Search of a Method.  The Teaching Experience, the

13  Houston Family Law Trial Institute, that should actually be

14  2010 through 2014.  I've participated in that on a year to year

15  basis the last four years.  And presentations, there have been

16  -- oh, this is dated June 9, 2012, not 2014.  That's why I was

17  (inaudible).  There have been several additional presentations

18  that I've done.  One was a full day on advanced testing at

19  AFCC Regional Conference, November of 2012.  Another about

20  ninety minute one at the same conference on evaluating families

21  with young children.  Another one testing at the UT School of

22  Law and AAML Chapter in January of 2013.  And one on cross-

23  examination on evidentiary issues regarding evaluation and

24  testing.  I did a full day for the New Jersey AFCC on

25  Psychological Testing in June of 2013.  I did one on cross

1   examining on psychological testing at AFCC Conference in May of

2   2014.  Was back at the UT School of Law, AAML Texas Chapter in

3   June of '14 regarding, the title is crazy, Your Client or Mine

4   but it had to do with issues of psycholopathology and the use

5   of the DSMV and then, also, I did a presentation in testing at

6   the Door County Summer Institute in Egg Habor, Wisconsin in

7   July.  So, then of course, there is going to be a bunch of -- I

8   mean, I can get you guys an updated thing.

9           MS. FRIEDMAN:  Counsel, would you agree to let

10          him get us a more up -- I didn't realize this one was

11          for 2012 -- get us an updated one and substitute it

12          in?

13          MR. MITCHELL:  Sure.

14          MS. FRIEDMAN:  As a --

15  MS. FRIEDMAN:

16  Q    And that would be the summary of your education

17  experience?

18  A    Otherwise, I'm just going to be prattling along about a

19  bunch of stuff that's happened over the past two years.

20          MR. MITCHELL:  No problem.

21  MS. FRIEDMAN:

22  Q    And I was going to ask you, you're Board Certified in

23  Forensic Psychology; is that correct?

24  A    Yes, I am.

25  Q    And would you tell the Court what that means?

8

1  A      Board Certification by American Board of Professional

2  Psychology is and I, essentially, submitted myself to the

3  American Board of Professional Psychology Academy of Forensic

4  Psychology to see if I qualify and have the knowledge, skill,

5  education and training experience to be given that special

6  status.  At current, there's 313 Board Certified Forensic

7  Psychologist alive.  I'm also Board Certified in Clinical

8  Psychology and there's roughly 40 of us dually boarded in

9  Clinical and Forensic Psychology.

10              MS. FRIEDMAN:  Offer Exhibit One at this time,

11          subject to it being substituted for a more current

12          version of his Curriculum Vitae.

13              MR. MITCHELL:  No objection.

14  **MS. FRIEDMAN:**

15  Q      Now, you were retained in this Moody -- the Moody divorce;

16  is that correct?

17  A      Yes.

18  Q      And what were you asked to do?

19  A      Well, as we mentioned earlier, initially, I was retained

20  and then I was asked to, essentially, review the records

21  provided to see if there were indications that the family

22  should be evaluated in some way and, particularly, as a child

23  custody evaluation, a standard where we evaluate the whole

24  family would be appropriate.

25  Q      And what did you review to enter -- to weigh in making

1   your decision, or your opinion as to whether or not a custody

2   evaluation would be appropriate for this family?

3   A    Well, I reviewed a hundred and nine documents, they're

4   outlined on Attachment A, starting on page ten of the report.

5   That includes Court documents, almost all of them are Court

6   related documents, Motions, Court Orders, transcripts,

7   Responses to Motion, Responses to Responses, a variety of texts

8   that took place between Ed and Angela Moody, and a few other

9   documents but there's, essentially, a hundred and nine.

10   Q    I'm going to hand you what's been marked as deposition

11   Exhibit No. 2 and ask if you can identify it as the report that

12   you prepared on this case.

13                (WHEREUPON, Exhibit No. 2 was marked for

14          identification purposes.)

15   **WITNESS:**

16   A    Yeah, this is it.

17   Q    All right.  I'd offer Exhibit 2.

18                MR. MITCHELL:  No objections.  Well, I take that

19          back.  Excuse me, I'm treating this as if it's a

20          discovery deposition.  We do object.  In Arkansas,

21          this would not be taken into evidence.  It's hearsay

22          and so, for the record, we object to introduction of

23          this into evidence.

24                MS. FRIEDMAN:  Okay.  We'll go through the

25          report then.  We would offer it as a summary of his

1    testimony.  Would you -- do you have an objection to

2    it as a summary of his testimony?

3         MR. MITCHELL:  Yes.  His report is inadmissible.

4    It's hearsay and while he could be impeached by use

5    of it, it should not rightfully be taken into

6    evidence.

7  **MS. FRIEDMAN:**

8  Q    What are your opinions that you have formed in this case?

9  A    There are, essentially, four opinions after reviewing all

10  these documents.  And one, there was concern about Angela's

11  credibility, honesty, and possible characterological issues.

12  Second, there were concerns about Angela's exposure of the

13  child to her paramour.  Third, issues regarding Ed's alcohol

14  use, possible substance abuse disorder.  And finally, the more

15  -- I guess the overriding issue is issues of high conflict, co-

16  parenting and gate keeping.

17  Q    Okay.  And based on those concerns, did you have an

18  opinion on whether or not a child custody evaluation would be

19  appropriate for this family?

20  A    Yes.

21  Q    And what is that opinion?

22  A    That it should be.  That I think it would be helpful for

23  the Court in trying to ferret out those issues and assist this

24  family, particularly the child.

25  Q    And would you explain to the Court why the child custody

1  evaluation is important, given the materials that you've

2  reviewed?

3  A    Well, given the concerns that I've raised, there are

4  issues about the mother, there's issues about the father, and

5  those would, ultimately, impact parenting and co-parenting.

6  This is clearly a high conflict case given that there's over a

7  hundred legal documents that I've reviewed back and forth

8  between the parties.  When you review the texts, it's pretty

9  clear that they have trouble communicating about simple issues

10  and that -- those kinds of problems, the issues with the mom,

11  the issues with the dad, not only effect their ability to co-

12  parent but certainly would effect their ability to parent this

13  child.  And so, I would think that that would be very helpful

14  to the Court in being provided that information.

15  Q    When you listed your concerns earlier, the first one was

16  Angela's credibility, honesty and possible characterological

17  issues.  Can you expand to the Court what that means?

18  A    Yeah.  There were several documents, and it starts on page

19  two, where issues regarding Angela Moody's credibility and

20  honesty were raised not only in some of the things that she had

21  done but even some of the comments made by a Court in the

22  documents which raised some concerns about not only credibility

23  and honesty but if there are characterological issues that

24  would need to be address in determining whether this would be

25  the appropriate primary parent for Eden.

12

1    Q    And when you say characterological issues, can you expand

2    on that for the Court.

3    A    Well, character, essentially we all have a character

4    structure.  Sometimes a character structure can be problematic

5    and it can reach the point of being diagnosable, DSM,

6    Diagnostic and Statistical Management, even though we are

7    currently on the Fifth Version, most people are still relying

8    on the Fourth, but it can also be addressing things like if

9    there's issues of narcissism, issues of psycopathy, problematic

10   features of someone's personality makeup that would -- that are

11   essentially ingrained and make it very difficult for that

12   person to be able to parent and co-parent in an appropriate

13   way.

14   Q    And what would an evaluator need to do to determine

15   whether or not the characterological issue -- I guess character

16   issues exist?

17   A    Well, obviously, one of the things would be a very

18   thorough set of interviews, looking at diagnostic criteria,

19   psychological testing is often used.  It would have to be

20   someone who is very competent, very fluid in that.  There's

21   also a review of psychological records or legal records and

22   other types of collateral records, like I did here, speaking to

23   collateral parties, essentially, garnishing as much information

24   as possible to provide the Court information about whether this

25   exists and if it does, to what extent and if it does and to

13

1   what extent, how it would effect the parenting and co-
2   parenting.
3   Q    And, obviously, you've not done an evaluation in this
4   case, correct?
5   A    No, I have not.
6   Q    Okay.  So, if someone were to -- the  Court were to
7   appoint someone to do an evaluation and they found that these
8   characterological issues existed, such as narcissism or
9   psychopathology, what effect would that have on a child?
10  A    Well, to correct, it's psychopathy.
11  Q    Psychopathy, sorry.
12  A    Psychopathology is the overriding, psychopathy is,
13  essentially, someone who has psychopathy is a psychopath.
14  Parents are only able to provide children with they,
15  themselves, are able to do unless they bring other people
16  involved.  So, if mother has characterological conditions,
17  she's going to be limited, to a certain extent, in the ability
18  to parent and also, to co-parent.  An individual with those
19  types of characteristics tends to be manipulative, shallow,
20  superficial, they lie, they create scenarios that -- and then,
21  change them if they get caught, and that's not the kind of
22  thing we try to teach our kids, unless you're trying to produce
23  another individual like that.  And so, those are the kinds of
24  things we try not to teach kids but, also, it makes for very
25  difficult co-parenting.  It's very hard to co-parent with

14

1  someone who has those types of features.

2  Q    Okay.  You mentioned co-parenting and gate keeping earlier

3  and you just mentioned co-parenting again.  Would you tell the

4  Court what the issue is with regard to co-parenting and gate

5  keeping from the materials that you've reviewed?

6  A    Well, gate keeping defined is attitudes and behaviors of a

7  parent towards the other parent that make it -- they interfere

8  with or facilitate involvement and contact with a  child.  So,

9  in this case, if Angela Moody is doing what's known as

10  restrictive gate keeping, she has attitudes and behaviors that

11  are interfering with or preventing Ed Moody from having a

12  involvement in the child's life and contact with the child.

13  So, that's the concept of gate keeping and it ranges on one end

14  of the continuum from facilitative gate keeping where a parent

15  goes out of their way to facilitate, encourage, has positive

16  attitudes towards the parent, thinks that it's important for

17  them to be involved and actually does what they can to increase

18  involvement to restrictive gate keeping where things are done

19  to either interfere with or prevent contact and involvement and

20  also, with co-parenting issues, they simply don't  believe that

21  that parent should have any input.

22  Q    And what effect does that have on a child if a parent is

23  exercising gate keeping?

24  A    Well, if they're -- if they're facilitative gate keepers,

25  that's great, that's what we want.  We want parents to do that

15

1    kind of thing.  And sometimes there's reasons that that doesn't

2    happen and this was one of the issues where the father has

3    substance abuse issues.  But on the other end of the spectrum,

4    if you have restrictive gate keeping, essentially, you're

5    depriving the child of input from the father and also,

6    involvement by the father in the child's life.  There's a lot

7    of research that (inaudible) looks at, what happens when you

8    interfere with a parent's relationship.  Also, father

9    involvement has been shown to be related to a variety of

10   positive outcomes but also, negative outcomes if there's

11   interference or reduced father involvement.

12   Q    Can you tell the Court what some of those negative

13   outcomes are if the father's not involved?

14   A    It can be things from problems in academics, in social,

15   getting in trouble with the law, substance abuse issues.

16   There's just about every positive thing that you can imagine we

17   want our kids to turn out could be negatively impacted because

18   of the lack of involvement.

19   Q    And can you tell the Court, specifically, an example of

20   something that you reviewed that made you think that, perhaps,

21   restrictive gate keeping was going on in the Moody case?

22   A    Well, one of the things I saw was the texts.  The texts

23   are pretty clear that Ed will make numerous contacts or texts

24   with Angela in an attempt, can I talk to Eden, can I talk to

25   Eden, there's no response.  And then, when there is a response,

MELANIE MILLER, CCR
(501) 590-6455

16

1    response is kind of snarky, attacking, comments like, you're
2    only supposed to use these texts for communicating with me
3    regarding the child and then, she'll use that to then attack
4    him on his substance abuse or other issues.  And a read of that
5    gives a pretty clear view that this is a high conflict case
6    where these people are just not able to do this kind of stuff
7    together.

8    Q    Can you give the Court an example of what would be
9    facilitory gate keeping and the same scenario, where Mr. Moody
10   texts Mrs. Moody and says, I would like to speak with Eden?
11   What would be a facilitory gate keeping response?

12   A    Sure, she's in the bathtub.  I'll have her call you soon
13   as she gets out.  And then, actually facilitating that phone
14   call.  And sometimes kids -- you know -- reality is not every
15   child wants to talk to a parent every night or whatever.  And
16   sometimes they've got their friends over or something but a
17   parent has to sometimes step in and say, you can take a few
18   minutes out of your game with your friends and talk to dad.
19   Essentially, providing the child with an understanding that
20   this is an important aspect of your life, too.

21   Q    Okay.  Now, you were provided with materials and you've
22   read in the texts that Mrs. Moody accuses Mr. Moody of having a
23   substance abuse problem?

24   A    Correct.

25   Q    And you've not evaluated that?

1    A    No.                                                                    17

2    Q    And that's something, an issue that you think should be

3    evaluated by this custody evaluator as well?

4    A    Absolutely.

5    Q    Do you know of anyone who would meet the requirements and

6    have the expertise in the areas in question in the Moody case

7    that's licensed in Arkansas that could perform a child custody

8    evaluation competently for this family?

9    A    Yes.  I only know one person.

10   Q    And would you tell the Court who that is?

11   A    It's Dr. Sol Rappaport.  He's out of Chicago.  He's also

12   licensed in Arkansas.  He's Board Certified in Clinical

13   Psychology and Child and Adolescent Psychology so, he's double

14   boarded and he has tremendous knowledge and understanding of

15   issues regarding character issues, issues associated with gate

16   keeping, substance abuse.  So, I think that would be -- I've

17   looked at his work, I've presented with this individual, I'm

18   very comfortable with someone like that being able to cover the

19   needs of this case.

20   Q    And do you think that Eden, the child, is someone who

21   deserves to be able to have an evaluation like that so that the

22   Judge can make the best orders possible for her?

23   A    Absolutely.

24            MS. FRIEDMAN:  Pass the witness.

25            MR. MITCHELL:  Thank you, Ms. Friedman.

18

**CROSS-EXAMINATION**

BY MR. MITCHELL:

Q    Dr. Flens, we met before your testimony but I'm Jeff Mitchell.  I represent Angela Moody in this case.  I have a few questions for you about your testimony today.  First of all, I think I heard you say that you've been hired by Mr. Moody to give this testimony; is that correct?

A    Correct.  Well, I've been hired by Mr. Moody to review the documents and then, based on that, whether they wanted me to proceed further, do I have an opinion.

Q    Suffice it to say, Doctor, that if your opinion didn't please Mr. Moody, you wouldn't be here testifying today?

A    I think we can agree on that, yes.

Q    Okay.  When were you first contacted by either Mr. Moody or Mr. Moody's counsel with respect to your testimony, perhaps reviewing records and providing an opinion in this case; do you remember?

A    Well, I know I was approached, roughly, two years ago by Mr. Moody.  As we mentioned earlier, we had a conversation.  I don't recall the conversation.  I did send my retainer agreement, he signed it and provided me with a retainer check.  And then, for roughly a year or so, the case was stagnant, I had no involvement.  And then, I was contacted by counsel, Diana Friedman, and what they, essentially, wanted me to do was what I did.  To look at these records and say whether I

19

1    thought there was some problems that could be addressed and if

2    that's what I came up with -- if I didn't, I would have let

3    them know, you know, I understand where you're coming from, I

4    can't support what you're asking.  And after I formed my

5    opinion, I was asked to put it in the form of a report.

6    Q    Do you remember my question, Dr. Flens?

7    A    Apparently not.

8    Q    It might help if you would answer my question and then,

9    perhaps, you can give a narrative if Ms. Friedman asks you for

10   that.   About two years, is that when you were first

11   contacted?

12   A    When I was first contacted.

13   Q    Okay.  Do you recall about how long ago it was that Ms.

14   Friedman provided you with materials to review?

15   A    It would be within the last twelve months.

16   Q    Did you, in the process of review of these materials, take

17   notes or make notes?

18   A    Really, the notes evolved into a report.  I mean,

19   literally, I don't have separate notes other than maybe some

20   highlighting in the documents that I reviewed.

21   Q    Did you save those documents that have highlights?

22   A    I believe they're saved.  When I save them, I save them

23   with the highlights.

24   Q    And did you save drafts of your report as you made them?

25   A    No, I did not.

20

1  Q    To the extent that you have notes in the margins of

2  materials that you read, did you destroy those notes --

3  A    No.

4  Q    -- and materials?  You still have those?

5  A    Yes, sir.

6  Q    Okay.  I would ask counsel to produce those to us and I

7  expect that you'll be able to gather those up and get those to

8  counsel for Mr. Moody within a reasonable time?

9  A    Oh, sure.

10  Q    The possible substance abuse disorder, you -- in your

11  report you have three areas of concern and then, you add to

12  that another important concern; is that fair to say?

13  A    (No response)

14  Q    Your concerns about Mrs. Moody's credibility, etc.,

15  second, concerns about the exposure of the child to Mr. Steve

16  Harrelson and then, third, Mr. Moody's alcohol use?

17  A    Correct.

18  Q    Your with me so far.  And then, you add to that,

19  importantly, issues of conflict, co-parenting and gatekeeping?

20  A    Yeah, I would have normally -- I normally would have just

21  said four but that seemed to be  an overriding issue.

22  Q    I understand that.  With respect to your concern about Mr.

23  Moody's potential substance abuse disorder, as you described in

24  your testimony, would a Psychologist be the best person to

25  assess Mr. Moody for that, in your professional opinion?

A    Either a Psychiatrist or a Psychologist.  Somebody who has the appropriate training, yes, I think that would be the appropriate person.

Q    And describe for me Dr. Rappaport's, in Chicago, particular expertise with assessing and determining whether a person possesses and is effected by substance abuse disorder?

A    I can't tell you what is on his C.V. offhand but I know in talking with him, this is an area that he frequently evaluates.

Q    But you would agree that we ought to get the best person available to assess these areas of concern that you've raised in your testimony, would you not?

A    Yes.

Q    Okay.  And so if, in fact, Dr. Rappaport in Chicago is an expert, as you've described him, in assessing the psychological, between the ears, capabilities of parents but if there's someone whose better suited to assess someone's potential for substance abuse disorder, perhaps even here locally, that person would be the better person to assess that particular issue, would he not?

A    Yes, as long as that information can then be integrated into the larger picture evaluation.

Q    How does a parent with a substance abuse disorder -- what's the effect on a child over the child's formative years, exposed to a parent with a substance abuse disorder?

A    Part of --

1  Q    (Inaudible) articulate that.

2  A    --  I'll try the best I can.  Part of the problem is going

3  to be the extent of that substance abuse disorder.  Is it

4  somebody who is -- and when I say substance abuse disorder I'm

5  really talking about substance dependence, difference between

6  alcohol abuse and alcohol dependence or alcoholism -- if we're

7  talking about someone who has -- occasionally, drinks too much

8  versus someone who has -- is normally drinking heavily on a day

9  to day basis, that can --  we're talking about a very different

10  set of scenarios.

11  Q    And you would -- you would agree that in your expert

12  opinion, the extent of the abuse and the acuity of the disorder

13  is important to know when assessing a person's ability to

14  parent?

15  A    Absolutely.

16  Q    Okay.  And from, at least the materials you've reviewed

17  and understanding that those materials were provided by Mr.

18  Moody, correct?

19  A    Correct.

20  Q    You have harvested from those materials and developed a

21  concern about the potential extent of Mr. Moody's substance

22  abuse disorder?

23  A    Correct.

24  Q    And how it might affect the child, Eden --

25  A    Yes.

1   Q   -- over her formative years.  What are the formative
2   years?  How long does all this matter?  Can you tell me?
3   A    I don't know that anybody can define what formative years
4   are.  We do know -- it used to be thought that brain
5   development stopped at about eighteen, it does not.  Obviously,
6   very early in life, the first couple of years, can make or
7   break whether this person is going to be able to form
8   appropriate attachments, relationships.  Then, as they get
9   older then, they start learning about moral issues.  So, when
10  children are young, if you help them develop certain,
11  essentially, temperaments and traits, those then carry on and
12  so, later we build on those things.
13  Q   Well, during those time periods, if a child is often
14  exposed to a parent that has developed an acute substance
15  disorder, how does that effect the parent's ability to give the
16  child what she needs?
17  A    Well, part of it, as you mentioned, is severity and
18  acuity.   The other issue is what are the behaviors, it always
19  comes down to that, what are the behaviors that that parent is
20  demonstrating while with the child.
21  Q   Well, there's certainly a physical danger that the child's
22  exposed to, correct?
23  A    Well, and again, it depends --
24  Q    The potential?
25  A    -- right, it depends on acuity and severity.

MELANIE MILLER, CCR
(501)590-6455

1  Q    Sure.  But assuming that the severity rises to the level
2  that it impacts parenting, the child would be at some physical
3  risk, correct?
4  A    Could be, yes, possibly.
5  Q    Probably, in fact, if it's acute enough?
6  A    If it's acute enough, yes.
7  Q    All right.  And there would be inattention, I would
8  expect, to the child's needs, assuming acuity?
9  A    There could be.
10  Q    Sure.  An indifference perhaps to the child's needs --
11  A    It --
12  Q    -- (inaudible) acuity?
13  A    -- it really would depend on the case.  But overall, sure,
14  that could be one of the possible issues.
15  Q    What would you expect, changing the subject just a little
16  bit, Dr. Flens, what would you expect the costs of this type of
17  evaluation to run, should the Court  -- do you know what Dr.
18  Rappaport's rates are as far as --
19  A    No, I do not.
20  Q    Okay.  Would you expect they'd be commensurate with your
21  own?
22  A    I don't know.  I think it, probably, is in the Chicago
23  area and it may be different, maybe lower down here.
24  Q    Would you expect that the tall building, Chicago
25  psychologist charge a higher rate than local Little Rock

1  psychologist do?

2  A    Yeah, but he's not a big building, downtown Chicago guy.

3  He's a more suburbs guy.

4  Q    You talked about your review of texts messages between the

5  parties in this case?

6  A    Yes.

7  Q    And did you ask for the universe of text messages that

8  were exchanged between Mr. Moody and Mrs. Moody since their

9  separation?

10  A    No, I was just given certain --

11  Q    You were provided with selected amount of texts --

12  A    Correct.

13  Q    -- I take it?  Okay.  Whether it was by Mr. Moody or

14  counsel?

15  A    Yeah, about four hundred pages of it.

16  Q    Okay.  Do you recall reading in any of those text

17  exchanges between the parties, whether by text or emails -- I

18  didn't see in your report that you read emails but, do you

19  recall any exchanges between the parties that you reviewed

20  where Mr. Moody was non-responsive to requests regarding

21  visitation from Mrs. Moody?

22  A    Yes.

23  Q    Describe those for me.

24  A    Well, just that.  I mean -- you know -- this is your time

25  and he doesn't respond.  I mean, there's stuff like that.

26

1  There's positive -- there's actually some positive stuff in
2  there, too.  There's some responsive stuff by the mom.
3  Q    But you would agree that you were able to discern from
4  this material that, at times, Mr. Moody is non-responsive to
5  requests for cooperation and facilitation of child custody and
6  visitation issues?
7  A    Correct.
8  Q    That can't be good for the co-parenting relationship, can
9  it?
10  A    No.
11  Q    You told me, before we started, and you may have testified
12  and if so, I apologize but that you charge Four Hundred Dollars
13  ($400) an hour for your review of materials and providing
14  testimony in a case like this?
15  A    Yes.
16  Q    Okay.  And in fact, that's what you charged Mr. Moody
17  since you've been asked to assist him in his preparation for
18  Trial?
19  A    Yes.
20  Q    Okay.  And I think I understand that to date you have
21  earned, through the course of your work for Mr. Moody in this
22  case, some Fourteen Thousand Dollars ($14,000)?
23  A    Correct.
24  Q    Now, bear in mind this is Jeff Mitchell math so, Fourteen
25  Thousand ($14,000) divided by Four Hundred ($400) looks to be

1   about thirty five hours?

2   A    Yes.

3   Q    Does that sound about right to you about  --

4   A    Yes.

5   Q    -- the time you spent forming these opinions that you

6   testified to?  And that doesn't include the time that you spent

7   traveling here today and testifying here today?

8   A    Correct.

9   Q    Okay.  So, we could expect that by the end of your trip

10  back home from your testimony here today Mr. Moody is going to

11  owe you several thousand dollars more; is that right?

12  A    Yes.

13  Q    Our Trial is set for the week of December 8 of this year

14  and have you been asked whether or not you would be available

15  to testify at that Trial?

16  A    I've been asked if I would be available, I don't if to

17  testify.

18  Q    Is there any reason why you couldn't be available the week

19  of December 8 to come and give your testimony to the Judge so

20  he could have the ability, in person, to assess your

21  credibility and hear your testimony live?

22  A    I -- unless I've got a conflicting Trial or a Hearing, I

23  don't see any problem with that.

24  Q    But you've known that that was the week of Trial for some

25  time,  I take it?

1   A    Correct.

2   Q    And you didn't discover a conflict since you found out

3   about that date, on your calendar; is that right?

4   A    I don't remember having any conflict.

5   Q    Okay.  I was provided a copy of your report before it was

6   discussed with you today but, in forming your opinions and

7   working for Mr. Moody in this case, you did prepare a report

8   and these opinions that you've expressed here today can all be

9   found in that; is that right?

10  A    Correct.

11  Q    Okay.  And that report was completed back in September of

12  this year?

13  A    Yes.

14  Q    You've testified here today that you had three areas of

15  concern and then, one overriding sort of concern that sort of

16  crystalized in your mind since you reviewed these materials

17  provided by Mr. Moody.  The first is concerns about Mrs.

18  Moody's credibility, honesty and possible characterological

19  issues.  Did I understand your testimony right about that?

20  A    Yes.

21  Q    Okay.  Her credibility issue, that was from your reading

22  of a transcript of a prior Hearing in this case; is that right?

23  A    There were several issues, if you look at page two --

24  Q    I'm not --  I'm just talking about your testimony, Dr.

25  Flens.  I listen to you testify and I didn't hear you explain

29

1   anything other than your recollection of a comment made by

2   Judge Smith in this case that had some bearing on Mrs. Moody's

3   credibility.

4   A    I'm not sure what your question is.

5   Q    Well, my question is, is that what led to the formation

6   of your opinion about her credibility being anissue in

7   parenting her child?

8   A    No.  It was the issues that I described in the report

9   starting on page two.

10  Q    Okay.  Well, if you have issues besides the concern that

11  you formed after reading about Judge Smith's comment about the

12  credibility of witnesses in a prior Hearing, what are those?

13  A    Well, there was -- I mean, there were she stole Ed Moody's

14  cell phone.  She tried to do a back door settlement and hide

15  the issue from Ed Moody with Russell & Lemay Plumbing.  I'm

16  sorry, that's (inaudible), but there was avoiding service, that

17  she removed Ed Moody's name from a USAA document, that under

18  the Court, the Judge's comments about her credibility on March

19  7, 2014.  So, those are related to issues with credibility and

20  honesty.

21  Q    Is that the complete list?  Is that everything that

22  helped you form your opinion that her credibility may have a

23  bearing on her ability to parent?

24  A    To the most part, yes.

25  Q    Okay.  And Dr. Flens, it's fair to say that all of what

1   you just expressed was --  are facts taken at face value from

2   information provided to you by Mr. Moody or his counsel; is

3   that right?

4   A    Yes.  I took -- I took the records at face value.

5   Q    You did no independent investigation to find out if any of

6   that was true in fact, did you?

7   A    No, I did not.

8   Q    Okay.  And does that not have -- cause you some concern if

9   you're forming opinions and testifying in this important case

10  about the parenting of this beautiful child based on

11  information provided to you by one of two parties in a very

12  adversarial and contentious divorce proceeding?

13  A    Let me correct you.  I'm not offering any opinions

14  regarding parenting this child.  I made that very clear in the

15  cautionary note, which is the first thing on the first page,

16  that I'm simply saying based on my review of some records, that

17  there are some concerns raised -- (inaudible) --

18  Q    Yeah, and your opinion is --

19  A    (Inaudible)  --

20                MS. FRIEDMAN:  Let him --

21                MR. MITCHELL:  -- Dr. Flens --

22                MS. FRIEDMAN:  -- excuse me. Let him finish

23         (inaudible) please.

24  **WITNESS:**

25  A    And that I'm suggesting to the Court, based on those --

31

1    it's the Court's decision.

2    Q    Sure.  You're -- you're opining based on concerns that

3    you formed after reading materials provided to you by one of

4    two adversaries in this proceeding; is that correct?

5    A    Correct.

6    Q    Solely on the basis of those materials provided to you by

7    that party?

8    A    Same thing, yes.

9    Q    And that doesn't give you any concern about the

10   reliability of your opinion in this case?

11   A    It -- it certainly limits the ability to generalize it,

12   yes.  I mean, a Court document is a Court document unless

13   they're -- it's fabricated or fraudulent.  The Court Order on

14   March 7 of 2014 says what it says.

15   Q    Sure.  And the Court Order of June 11, 2013 would also say

16   what it says, would it not?

17   A    Sure.

18   Q    Okay.  So, let's talk about your concern about the

19   exposure of Eden Moody to Mr. Steve Harrelson.  You've noted

20   that as one of the basis for forming your opinion that a

21   psychological evaluation should be performed; is that right?

22   A    Yes.

23   Q    Okay.  And your knowledge of the exposure of this child to

24   Steve Harrelson comes from information, again, provided by  Mr.

25   Moody or his counsel, right?

1    A    Yes.

2    Q    Which you've taken at face value?

3    A    Correct.

4    Q    Okay.  Do you realize or did you know, I assume you did

5    not, that the only credible evidence before the Court on this

6    issue is that Mr. Harrelson met this child perhaps two times,

7    perhaps for no more than a few minutes prior to June 11, 2013?

8    A    I -- (inaudible) --

9              MS. FRIEDMAN:   Object --

10             WITNESS:  (Inaudible)

11             MS. FRIEDMAN:  -- objection, assumes facts not

12        in evidence and argumentative.

13             MR. MITCHELL:  Well, it doesn't assume facts not

14        in evidence.

15   **MR. MITCHELL:**

16   Q    It was testimony provided by Mr. Harrelson, as a matter of

17   fact, yesterday which you weren't a party to because you

18   weren't here; is that right?

19             MS. FRIEDMAN: I'm going to object, counsel being

20        argumentative and that evidence is not before the

21        Court and this is an Evidentiary Deposition.

22   **MR. MITCHELL:**

23   Q    You can still answer the question.

24   A    I have no knowledge, one way or the other.

25   Q    Okay.  Well, Mr. Harrelson testified yesterday that he'd

1   only met Eden a couple of times for a few minutes in each

2   instance prior to June of 2013 -- would you still have concerns

3   about her exposure to him?

4           MS. FRIEDMAN:  Objection.  The question assumes

5          facts not in evidence.  That was not consistent with

6          Mr. Harrelsons's testimony yesterday.

7           MR. MITCHELL:  Okay.  We can argue about that

8          later.

9   **MR. MITCHELL:**

10  Q    But if he did testify that way, would you still have those

11  concerns?

12  A    I would probably reduce those concerns.

13  Q    I would think so.  And if the Court's Order of June 11,

14  2013 says merely that unless related by blood or marriage,

15  neither party shall have overnight guests of the opposite sex,

16  would you defer to the Court's better judgment of the child

17  being around this person for some period of time, not in

18  violation of the Court Order, is probably not a bad reflection

19  on parenting?

20  A    I don't know that --  whether my opinion was based on

21  whether it was consistent with the Court Order.  It was based

22  on the description of the individual as described in the

23  documents.

24  Q    Which were provided to you by Mr. Moody?

25  A    Correct.

1   Q    Okay.  And taken at face value?

2   A    I don't know any other way to take a document other than

3   face value.

4   Q    And you, certainly, didn't take documents from the other

5   party in this adversarial proceeding that might shed light on

6   this in a different way?

7   A    Actually, I did take -- if you look at the list, there are

8   numerous documents that were, not provided by but were your

9   client's responses to those documents.  So, I mean, there is

10  some bipartisanship in terms of these records I reviewed.

11  Q    Suffice it to say that you didn't make any requests of

12  Mrs. Moody or me to provide you information that might shed a

13  different light on the materials that you were provided?

14  A    No, I did not.

15  Q    Are you aware that you can Google search Dr. James Flens

16  and find on the Internet a fairly long article about your past

17  at a website called shrinksgonewild.com?

18              MS. FRIEDMAN:  Objection, relevance.

19  **WITNESS:**

20  A    Yes, I'm aware of that.

21  Q    Okay.  And I would expect that you've read it?

22  A    Yes, I have.

23  Q    And I would expect that you would take exception with a

24  lot of how that information, historical information,

25  biographical information about you is reported on that website,

35

1  would you not?

2  A   Yes, I would.

3  Q   And if given an opportunity you could, certainly, provide

4  an explanation or perhaps completely and absolutely refute some

5  of the information that appears on that website, correct?

6  A   Correct, and I did.

7  Q   And where is your response to that?  Where can I find

8  that?

9  A   You won't find it because the reporter did not provide

10  that information.

11  Q   But, nevertheless, you would agree with me, would you not,

12  that if given an opportunity, you would challenge the source of

13  this information as biased?

14  A   Yes.

15  Q   And biased for whatever reason, biased that they were

16  dissatisfied with your professional services, biased because

17  you provided excellent services to a party in an adversarial

18  proceeding, perhaps?

19  A   Yes, perhaps.

20  Q   Biased because they just don't like the way you walk down

21  the street --

22  A   Absolutely.

23  Q   -- correct?

24  A   My hunch is it's not really (inaudible) to that.

25  Q   Well, probably not but, nevertheless, the source of

MELANIE MILLER, CCR
(501)590-6455

36

1   information that someone might use to form an opinion about you

2   should be filtered through it's reliability, should it not?

3   A    Certainly.

4   Q    I mean, you would probably like the opportunity to refute

5   that you, as this says, punched a prostitute on the lawn of

6   your home in the face, would you not?

7            MS. FRIEDMAN:  Objection, hearsay and relevance.

8   **MR. MITCHELL:**

9   Q    Are you aware that that's been reported?

10  A    Yes, I'm aware that's in there.

11  Q    And I suspect you'd like to tell your side of the story on

12  that, would you not?

13  A    My side of the story has been told to the Police in

14  documents and is inconsistent with --  I'd suggested you

15  actually look at the Police Report as opposed to a -- something

16  like that.

17  Q    Exactly, Doctor, exactly.  You would discourage anyone

18  from forming an opinion about you based on information provided

19  from a biased source, would you not?

20  A    Correct.

21  Q    You would agree that Mr. Moody in this case is a biased

22  source of information as far as these proceedings are

23  concerned?

24  A    I believe that he has, certainly, his side.  I take

25  exception to describing the documents I reviewed, particularly

37

```
 1   those for example, a deposition or Court Order, where there are
 2   -- I mean, that's --  a deposition transcript is the four
 3   corners of the document --
 4   Q    Doctor --
 5   A    -- (inaudible) --
 6   Q    -- I'm sorry.
 7   A    -- Court Order --
 8   Q    -- I apologize.
 9   A    -- is -- it's certainly not Mr. Moody's description.  It's
10   the Court's description.  So, I think that there are numerous
11   documents that I reviewed that are both reliable and valid.
12   Q    Can you point me to one instance, Dr. Flens, where you
13   requested of Mr. Moody or his counsel information that was not
14   provided to you in order to allow you to form an unbiased,
15   objective, even-handed opinion in this case?
16   A    Uh --
17   Q    Can you produce one email (inaudible) --
18   A    -- no, I cannot.
19   Q    In fact, all the information that you've been provided
20   that forms the basis of your opinions in this case has been
21   hand selected by Mr. Moody or his counsel and provided to you?
22   A    Correct.
23   Q    In fact, I think you told me that -- and you realize Mrs.
24   Moody has been the custodial parent, party in this case since
25   the separation of the parties back in, sometime in 2011 --
```

1  A     That's my understanding, yes.

2  Q     Okay.  Or perhaps in late 2010, I could be wrong about

3  that, and nevertheless, you offered your opinion that's been

4  formed in the Fall of this year that there should be a

5  psychological evaluation done.  However, that opinion was not

6  based in any part on your personal interaction with the

7  parties; am I right about that?

8  A     Yes, and I put that on the front page in a warning,

9  cautionary note, that I didn't do any sort of evaluation of any

10 of the parties.

11 Q     We appreciate you cautioning the Court on that.  You've

12 never spoken in any material sense about this case with Mr.

13 Moody?

14 A     No.

15 Q     You've never spoken in any material sense with Angela

16 Moody about this?  In fact, you never met her before today,

17 have you?

18 A     I didn't meet any -- either of parties.

19 Q     You never met Eden Moody, the child?

20 A     Correct.

21 Q     How old is Eden?

22 A     She is five years old.

23 Q     Okay.  She's six, Mr. Flens.  Do you know where she goes

24 to school?

25 A     She's six and a half, January 9, 2008.  I do not know

39

1   where she goes to school.

2   Q    Do you even know the name of her teacher?

3   A    No, I don't.

4   Q    Do you have any sense of what her most recent report card

5   would reflect about her academic progress?

6   A    No, I don't.

7   Q    Did you consult with her teacher to get her objective

8   assessment about how this child is getting along in life?

9   A    Well, as I already testified several times, I have not

10  spoken to anyone about the case.

11  Q    Did any of the materials provided to you by Mr. Moody

12  illuminate the fact that this child is well adjusted and doing

13  quite well socially and academically?

14  A    I did not review any records regarding that.

15  Q    In fact, do you have any information about how she

16  interacts socially with her peers?

17  A    No, I do not.

18  Q    Or with other adults?  Do you know what she eats?  Do you

19  know her diet?  Do you -- do you know how well she eats on a

20  regular basis, Eden?

21  A    I think it's been pretty clear from my testimony that I

22  don't have that information.

23  Q    Do you know how regularly she sleeps at night?

24  A    No, I do not.

25  Q    Did you ever have a conversation or review any materials,

40

1   favorable or not, from the child's therapist, Dr. Dawn Doray?

2   A     No, I have not.

3   Q     Did you know that she had one?

4   A     No, I did not.

5   Q     Did you know that she was encouraged and that Angela Moody

6   facilitated the sessions that the child has been exposed to

7   with Dr. Doray?

8   A     I have no information.

9   Q     Did you know that that was bourne out of Mrs. Moody's

10  concern that the child, should she have any issues that

11  couldn't be expressed to the parents directly, would have

12  someone to talk to and help her work that out?

13  A     As I've already testified, I would have no information

14  regarding that.

15  Q     Did you have any idea before you came here today that Dawn

16  Scott, Mrs. Moody's best friend, would testify under oath that

17  she's had ample opportunity to express Mrs. -- to observe Mrs.

18  Moody's parenting and over the years that she's observed it,

19  she's seen nothing but the kind of characteristics of a parent

20  that she herself would hope to display?

21          MS. FRIEDMAN:  Objection, assumes facts not in

22          evidence.

23  **WITNESS:**

24  A     I don't have any information.

25  Q     Well, why not?

41

1    A    Well, as I testified probably a dozen times so far, and
2    I've outlined in cautionary note, I didn't do that sort of
3    evaluation, sir.
4    Q    We appreciate that, Dr. Flens.  No more questions.
5                    RE-DIRECT EXAMINATION
6    BY MS. FRIEDMAN:
7    Q    Dr. Flens, Mr. Mitchell just asked you a whole series of
8    questions about things that you've not reviewed or things that
9    were not provided to you.  Are those the types of things that
10   need to be provided to an independent evaluator to do a child
11   custody evaluation?
12   A    Yes.
13   Q    Were you asked to do a child custody evaluation?
14   A    No.
15   Q    And you've not done one?
16   A    No, I have not.
17   Q    And if the Court appoints a child custody evaluation are
18   all the things that Mr. Mitchell raised the types of things
19   that a child custody evaluator should be reviewing and looking
20   at making their recommendations to the Court?
21   A    Absolutely.
22   Q    Is there anything wrong with you having reviewed what you
23   reviewed and suggest and making, forming an opinion that a
24   child custody evaluation is in order?
25   A    Not that I'm aware of, no.

1   Q    And all the items that Mr. Mitchell talked about that you

2   didn't review, those -- those are arguments in favor of an

3   evaluation, are they not?

4   A    Certainly.

5   Q    Now, with regard to the Trial setting, you were originally

6   asked to testify at a Hearing that was scheduled for October

7   21; is that correct?

8   A    Yes.

9   Q    And you had a conflict with that date; is --

10  A    Yes --

11  Q    -- that right?

12  A    -- I did.

13  Q    And that's why we were taking your Evidentiary Deposition

14  today; is that correct?

15  A    Yes.

16  Q    And so, the issue with Trial didn't really come up until

17  that Hearing was removed?

18  A    Correct.

19  Q    Now, I have marked as Exhibit Three pages ten through

20  fifteen of your report, which is Attachment A, records

21  reviewed.

22              (WHEREUPON, Exhibit No. 3 was marked for

23              identification purposes.)

24  **MS. FRIEDMAN:**

25  Q    Can you identify that for --

43

1          MR. MITCHELL:  Objection, hearsay, best

2     evidence.

3 MS. FRIEDMAN:

4 Q    -- can you --

5 A    Yeah, those are the pages ten through fifteen of my

6 report.

7 Q    Okay.  And if I were to ask you to name off on the record

8 all one hundred and nine items that you reviewed, would this be

9 your testimony of the hundred and nine things that you reviewed

10 (indicating)?

11 A    Yes.

12          MR. MITCHELL:   Objection, same objection.

13          MS. FRIEDMAN:  Offer Exhibit Three.

14          MR. MITCHELL:  Objection, hearsay and best

15     evidence.

16          RE-DIRECT EXAMINATION - (Continuing)

17 BY MS. FRIEDMAN:

18 Q    Now, with regard to the texts that Mr. Mitchell asked you

19 about that Mrs. Moody sent Mr. Moody and he didn't response --

20 do you remember those -- that question?

21 A    Yes.

22 Q    Do you know whether or not there were phone calls

23 afterwards, that Mr. Moody may have called Angela as opposed to

24 responding to the texts?

25 A    I have no information about that.

44

1    Q   And that would something that an evaluator ought to be

2    looking at, correct?

3    A   Correct.  Certainly, they'll be follow up questions after

4    reviewing all these.

5    Q   And with regard to an evaluator, if the Court deems it

6    appropriate to appoint a child custody evaluation, what -- do

7    you have an opinion about how the Order should read in terms

8    what he should be asked to do, he or she?

9            MR. MITCHELL:  Objection.  The witness has

10          testified that all -- he's testified the universe of

11          his opinions in this case.  To the extent that you're

12          asking him to testify on any additional opinion,

13          which he has had no opportunity to discover, we would

14          object to this testimony and ask that any testimony

15          in response to this question be stricken.

16          MS. FRIEDMAN:  Actually, counsel, this is in

17          follow up to your discussion with Dr. Flens before we

18          started.

19          MR. MITCHELL:  Did I misunderstand, counsel,

20          that you just asked him for an opinion, an additional

21          opinion?

22          MS. FRIEDMAN:  I asked him how he thought the

23          Order should be fra-- if there's any specific

24          elements that ought to be included in the Order for

25          whoever is asked to do an evaluation.

45

1          MR. MITCHELL:  And I voice the additional

2      objection, that's going to be the  province of the

3      fact finder and basically the province of the Judge.

4              **RE-DIRECT EXAMINATION - (Continuing)**

5  **BY MS. FRIEDMAN:**

6  Q    You can answer the question, Dr. Flens.

7  A    Well --

8          MR. MITCHELL: (Inaudible)-- beyond this

9      witnesses expertise.

10 **WITNESS:**

11 A    -- I think addressing the four issues that I've outlined.

12 Q    Well, first of all before you answer that, is that within

13 your expertise?

14         MR. MITCHELL:  Well, that's self-serving.  That

15     calls for -- objection, same objection.

16 **MS. FRIEDMAN:**

17 Q    Dr. Flens, you can answer the question.  Is it within your

18 area of expertise how these Orders should read.

19         MR. MITCHELL:  That's bolstering testimony, same

20     objection.

21 **MS. FRIEDMAN:**

22 Q    You can answer.

23 A    I believe it is, yes.

24 Q    Do you speak on that topic?

25 A    Yes, I do.

1    Q    And do you speak -- where do you speak on that topic?

2    A    At National and Regional Conferences to psychologists,

3    lawyers, the jury, judges, AAML, AFCC, things of that nature.

4    Q    And in the event the Court does not know, would you tell

5    the Court what AAML is?

6    A    American Academy of Matrimonial Lawyers.

7    Q    And what is AFCC?

8    A    That's Association of Family and Conciliation Courts.

9    Q    And would you tell the Court what your opinion is with

10   regard to the best way to draft the Orders to get a good

11   evaluation?

12              MR. MITCHELL:   Same objections.

13   **MS. FRIEDMAN:**

14   Q    You can answer.

15   A    I strongly recommend, there's a lot of things that have

16   been written on this issue and I've seen and presented on it,

17   that it should be very specific what information the Court

18   wants to know, not just a general custody evaluation but on the

19   specific issues, for example, Mr. Moody's substance abuse

20   issue, what's the extent of that, how does it effect parenting

21   and co-parenting, the mother's potential characterological

22   issues, how does that effect parenting and co-parenting.

23   Things of that nature should be specifically addressed so the

24   evaluator knows what to be looking for.  And in a lot of these

25   cases there are irrelevant things that come up and that just

47

1   take up time and be wasteful of the Court's resources.  So, I

2   believe it's always best to specify what the Court is asking

3   for.

4   Q    Now, with regard to your concerns about Mrs. Moody,

5   specifically, her credibility, honesty and possibly

6   characterological issues, the documents that formed the basis

7   of your concern are -- were they documents that Mr. Moody

8   created or were they other documents?

9                MR. MITCHELL:  Objection.

10  **MS. FRIEDMAN:**

11  Q    You can answer.

12  A    I was going to -- I thought he was going to finish his

13  objection.

14               MR. MITCHELL:  Well, I'm not smart enough to

15       form it yet so, you can go ahead answer.

16  **WITNESS:**

17  A    I'm sorry.  Those are documents that I was provided.

18  They looked like they had been filed with the Court in some

19  cases where they have Exhibits on them, there is testimony in

20  sworn depositions and Hearings, Court Orders.  So, I -- they

21  certainly looked legitimate to me.

22  Q    Okay.  And then, you had expressed the concern about Mr.

23  Moody's alcohol use.  Where -- what documents did you review?

24  Where did that come from?

25  A    Those came from a Temporary Order, a Supervision

48

1    Agreement, a Motion for Psychological Testing and the Response

2    to that, Emergency Motion for Production and Emergency -- and

3    Response.  So, these were all Court related documents.

4    Q    So, the types of documents you looked at when you --  when

5    you're telling the Court that you have concerns about these

6    issues, they're the same types of documents--

7    A    Yes.

8    Q    -- correct?

9    A    Yes.

10   Q    And do you think it's a fair comparison to say that you

11   have biased information based on Court documents as compared

12   to this website called shrinksgonewild?

13   A    No, I don't.

14   Q    Based on the questions that Mr. Mitchell asked you about

15   various documents that you didn't review, that you didn't have

16   access to, is there any -- would that information make it more

17   or less likely that the Court should have an evaluation, a

18   child custody evaluation in this case?

19   A    Let me -- let me stop you here.  I was kind of distracted

20   because I think he was trying to do a time out and I wasn't

21   paying quite enough attention to the question.

22              MR.  MITCHELL:  I was just asking my client to

23         keep her seat for a second.

24              WITNESS:  Okay.  So, I guess I need you to

25         restate.

49

MS. FRIEDMAN:   Certainly.

MR. MITCHELL:   Guess I do, too.

**MS. FRIEDMAN:**

Q    Okay.  With regard to the questions that Mr.  Mitchell asked you about lists of docu-- types of documents, types of information that you testified you did not have --

A    Yes.

Q    -- do you recall those questions?

A    Yes, yes.

Q    Would the fact that you -- that you don't have that information, is that a -- a reason -- more of a reason why the Court should appoint an evaluator who would have access to everything and be able to make recommendations to the Court?

A    Yes.

Q    No further questions.

MR. MITCHELL:   None for me.

VIDEOGRAPHER:   Okay.   This will conclude the deposition.   We're off the record at 10:58 a.m.

(WHEREFORE, the deposition was concluded at 10:58 a.m.)