IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

ANGELA MOODY                                                              PLAINTIFF

v.                                    No.: <u>4:22-CV-330-JM</u>

JAMES R. FLENS, Ph.D.                                                     DEFENDANT

---

### DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

---

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas, Defendant, James R. Flens, Ph.D., hereby annexes a short and concise statement of the material facts as to which he contends there is no genuine dispute to be tried:

A.      Procedural History.

1.      Plaintiff, Angela Moody ("Ms. Moody"), first brought suit against Defendant, James R. Flens, Ph.D. ("Dr. Flens"), on September 20, 2017, in the Circuit Court of Pulaski County, Arkansas. *See* Exhibit A – Complaint, *Angela Moody v. James R. Flens*, Circuit Court of Pulaski County, Arkansas, Case No. 60CV-17-5247.

2.      On January 21, 2021, the circuit court notified Ms. Moody that her action would be dismissed for want of prosecution unless she notified the court within two weeks. Exhibit B – Letter from Court, January 21, 2021.

3.      Dr. Flens filed a Motion to Dismiss for want of prosecution on January 22, 2021, in which he noted that no action had been taken in the matter since a status hearing on October 22, 2018. Exhibit C – Motion to Dismiss, ¶ 8.

4.     The circuit court dismissed Ms. Moody's action on January 28, 2021. Exhibit D –
Dismissal Order Without Prejudice.

5.     Ms. Moody refiled her action against Dr. Flens on January 27, 2022. Exhibit E –
Complaint, *Angela Moody v. James R. Flens, Ph.D.*, Circuit Court of Pulaski County, Arkansas,
Case No. 60CV-22-656.

6.     Dr. Flens was personally served on March 11, 2022. Exhibit F – Return of Service,
April 6, 2022.

7.     Dr. Flens filed his Answer and removed the action to the United States District
Court for the Eastern District of Arkansas on April 8, 2022. Exhibit G – Answer; Exhibit H –
Notice of Filing of Notice of Removal.

8.     Ms. Moody alleges wrongdoing by Dr. Flens after Dr. Flens was "retained as a
forensic psychology consultant" by her ex-husband, Edward Moody ("Ed Moody"). Exhibit E, ¶
3.

B.     The Divorce Proceedings Between Ms. Moody and Ed Moody.

9.     Ed Moody retained Dr. Flens's services in connection with the ongoing divorce
proceedings filed by Angela Moody. Exhibit I – Consultation Report, p. 1.

10.     Ms. Moody filed her Complaint for divorce on April 1, 2011, in the Circuit Court
of Pulaski County, Arkansas. The matter is styled *Angela Moody v. Edward Moody*, Circuit Court
of Pulaski County, Arkansas, Case No. 60DR-11-1586.

11.     The divorce decree was entered on or about January 8, 2015. Exhibit J – Deposition
Testimony of Angela Moody, p. 11:4–6.

12.     It took four years for the divorce decree to be entered because of various issues
including whether a purported pre-nuptial agreement could be enforced, the amount of marital

property included in the marital estate, and extensive discovery. *Id.* at pp. 10:9–24, 15:6–16, 17:4–17.

13.     The Moody's divorce was contentious. *Id.* at pp. 11:25–13:2.

14.     Even after the divorce decree was entered, the parties have routinely appeared before the circuit court to address various disputed issues, including visitation, and compliance with the property settlement agreement. *Id.* at pp. 12:9–13, 12:21–24, 12:25–13:10.

15.     During the pendency of the divorce proceedings, Ms. Moody was awarded temporary custody of the Moody's minor child subject to Ed Moody's visitation. Exhibit K – Temporary Order of November 18, 2011, ¶ 2.

16.     Both Ms. Moody and Ed Moody have applied to the circuit court for relief on various issues after the decree has been entered. Exhibit J, p. 13:11–21.

17.     The custody of the Moody's minor child was at-issue and contested in the divorce proceedings, and Ms. Moody was designated as the primary physical custodian in the divorce decree. Exhibit L – Decree of Divorce dated January 8, 2015, ¶ 4.

18.     The Moodys' minor child was not represented by a guardian ad litem during the divorce proceedings. Exhibit J, p. 18:8–10.

19.     The Moodys appeared before the circuit court as recently as November 30, 2022, hearing. *Id.* at p. 12:17–20.

20.     In connection with the divorce proceedings, Ms. Moody retained a private investigator and a forensic accountant. *Id.* at pp. 14:24–15:9.

21.     Dr. Flens was the only expert retained by Ed Moody to Ms. Moody's knowledge. *Id.* at p. 14:18–23.

22.     Around the time Dr. Flens issued his Consultant Report, the Moodys were preparing for a final hearing in the divorce proceedings. *Id.* at p. 16:9–19.

C.     Dr. Flens's Consultation Report.

23.     Dr. Flens was retained to review records provided by Ed Moody's counsel, "and asked to determine if a child custody evaluation would possible be helpful to the" court presiding over the Moodys' divorce "in determining the physical and/or legal custody of the Moody's minor child . . . ." Exhibit I, p. 2.

24.     In other words, Dr. Flens "was asked . . . to review the records provided to see if there were indications that the family should be evaluated in some way . . . ." Exhibit M – Deposition testimony of James R. Flens, p. 8:15–24.

25.     Dr. Flens "specialize[s] in child custody evaluation" and "sub-specialize[s] in psychological testing as it's used in the child custody arena." *Id.* at p. 5:19–22.

26.     He is board certified by in forensic psychology and clinical psychology by the American Board of Professional Psychology. *Id.* at p. 7:21–8:9.

27.     After being retained by Ed Moody, Dr. Flens "issued a 'Consultant Report' on September 3, 2014" and "traveled to Arkansas to testify an [sic] evidentiary deposition as a clinical and forensic psychologist." Exhibit E, ¶ 3.

28.     In the Consultant Report, Dr. Flens "rendered opinions about Plaintiff and Plaintiff's ex-spouse . . . ." *Id.* at ¶ 6.

29.     In preparing the Consultation Report, Dr. Flens reviewed records provided by counsel for Ed Moody in the divorce proceedings. Exhibit I, pp. 1–2, 8, 10–15.

30.     Dr. Flens reviewed at least 109 records totaling over 1900 pages. The records he reviewed were predominantly filings in the divorce proceedings, but the records also included other litigation involving the Moodys and text messages between the parties. *Id.* at pp. 10–15.

31.     After "[a] review of the documents provided," Dr. Flens identified "several issues" and opined that the issues "may need to be addressed by the Court" to resolve unresolved matters in the Moodys' divorce including the "physical and/or legal custody" of the Moodys' child. *Id.* at p. 2.

32.     Dr. Flens expressed his "belie[f]" that these issues "should be evaluated by a competent forensic psychologist." *Id.* at p. 1.

33.     Dr. Flens identified three key issues that he felt should be evaluated further by a competent forensic psychologist. These issues are "concerns about [Ms. Moody's] credibility, honesty and possibly characterological issues;" "concerns about [Ms. Moody] expos[ing the Moodys' minor child] to her paramour;" and "issues regarding Ed[] Moody's alcohol use." *Id.* at p. 1.

34.     Dr. Flens also opined that the "most important[]" consideration for the circuit court regarding the custody of the Moodys' child was "the intertwined issues of high conflict, co-parenting and Gatekeeping." *Id.*

35.     Dr. Flens identified that high conflict, co-parenting and Gatekeeping were "overriding issue[s]." Exhibit M, p. 10:8–16.

36.     In coming to his opinions, especially the "importance of a[ forensic psychological] evaluation for th[e] family," Dr. Flens "rel[ied] upon the work of Austin and others in their descriptions of assessing Gatekeeping." Exhibit I, p. 1.

37.     Based on Dr. Flens's concerns, he formed a professional opinion that a child custody evaluation was appropriate and "would be helpful for the Court in trying to ferret out th[e] issues and assist this family, particularly the child." Exhibit M, p. 10:17–24.

38.     At the beginning of his Consultation Report, Dr. Flens included a "***Cautionary Note***," which provided that the report was completed after a review of records, Dr. Flens had not evaluated either Ms. Moody or Ed Moody, and Dr. Flens had not evaluated their minor child. Exhibit I, p. 1.

39.     For the reasons listed in the "***Cautionary Note***," Dr. Flens noted that he could not offer "recommendations . . . regarding the physical and or legal custody of the Moody[s'] minor child." *Id.*

40.     Regarding the first issue, Dr. Flens concluded that "there [were] numerous documents related to [Ms. Moody's] credibility and honesty," which "could also suggest concerns regarding [her] characterological issues." *Id.* at p. 2.

41.     In support of his conclusion, Dr. Flens provided "example[s]" from the documents he reviewed. The examples included (1) paragraph 12 of the complaint in *Beauregard, Inc. v. Edward Moody and Angela Norwood Moody*, Circuit Court of Pulaski County, Arkansas, Case No. 60CV-06-2168; (2) a summary of Little Rock Police Department Incident Report No. 2012-110588, dated October 5, 2012; (3) contemporaneous notes made by Ed Moody about his cell phone, including a suspicion that Ms. Moody had installed spyware on his phone and removed him as an account holder for his phone; (4) portions of the Affidavit for Warning Order in *Russell & LeMay Plumbing & Heating, Inc. v. Angela Moody*, Circuit Court of Pulaski County, Arkansas, Case No. 60CV-13-2616; (5) a summary of a letter from USAA notifying Ed Moody that he had been removed as an interested party from his daughter's USAA account and a note how such action

appeared in conflict with an order from the circuit court; (6) paragraph 50 of a March 7, 2014, Order entered by the circuit court in which the court found that "[t]he testimony of [Ms. Moody], after observing her demeanor, was the least credible of the witnesses to testify" and expressed a "concern[] that [Ms. Moody] was not always truthful with the Court in all respects;" and (7) paragraph 6–9 of Ed Moody's Response to Plaintiff's Motion for Contempt for Failure to Provide Funds for Litigation . . . and or Suit Money. *Id.* pp. 2–3.

42.     The examples listed by Dr. Flens were either direct quotations from or his summaries of the records he reviewed to complete his report. *Id.*

43.     Dr. Flens did not, himself, make a statement of fact that Ms. Moody was not credible or honest or that she had characterological issues. *Id.*

44.     He expressed an opinion that the documents "related" to or may "suggest concerns" regarding her credibility, honesty, and potential characterological issues. *Id.*

45.     The second issue identified by Dr. Flens were allegations that Ms. Moody exposed the Moodys' minor child to her romantic partner. *Id.* at p. 4.

46.     In his Consultation Report, Dr. Flens included examples from Ed Moody's Second Motion for Contempt and Fourth Motion for Contempt. The examples were direct quotations of paragraphs 1 to 3 and paragraph 1 to 4 from the respective motions. *Id.*

47.     Dr. Flens did not state, as a fact, that Ms. Moody did expose the minor child to her romantic partner. *Id.*

48.     The third issue identified by Dr. Flens was Ed Moody's alcohol use. *Id.* at p. 5.

49.     Dr. Flens included examples from six records that demonstrated why Dr. Flens considered Ed Moody's alcohol use an issue to be further evaluated. *Id.* at pp. 5–7.

50.   Dr. Flens "[a]bsolutely" believes that Ed Moody's alcohol use should be evaluated by a forensic psychologist along with the issues he identified with Ms. Moody.  Exhibit M, pp. 16:21–17:4.

51.   Lastly, Dr. Flens concluded that the "intertwined issues of high conflict, co-parenting and Gatekeeping" also supported his opinion that the family should be evaluated by a competent forensic psychologist. Exhibit I, p. 1.

52.   In his opinion, high conflict co-parenting and Gatekeeping are "overriding . . . concern[s]". Exhibit M, p. 28:14–20.

53.   Dr. Flens "reviewed over found hundred pages of text messages between [Ms. Moody] and [Ed Moody]." Exhibit I, p. 7.

54.   He concluded that the "text[s] show a patten of communication between [Ms. Moody] and [Ed Moody] that indicates a high conflict co-parenting relationship." *Id.*

55.    Dr. Flens also concluded that Ms. Moody's "behavior raise[d] significant concerns regarding restrictive gatekeeping." *Id.*

56.   Gatekeeping is a "concept" that "ranges on one end of the continuum from facilitative gatekeeping where a parent goes out of their way to facilitate, encourage, ha[ve] positive attitudes towards the other parent, think[ing] that its important for them to be involved and actually does what they can to increase involvement to restrictive gatekeeping where things are done to either interfere with or prevent contact and involvement" with the other parent. Exhibit M, p. 14:13–20

57.   It involves the "attitudes and behaviors of a parent towards the other parent that make it – they interfere with or facilitate involvement and contact with a child." *Id.* at p. 14:2–8.

58.     In general, psychologists want parents to exhibit facilitative gatekeeping. *Id.* at p. 14:22–15:1.

59.     On the other hand, negative outcomes are associated with restrictive gatekeeping, where a parent, generally the custodial parent, interferes with the relationship of, generally, the non-custodial parent. *Id.* at p. 15:3–11.

60.     The negative outcomes that have been identified with restrictive gatekeeping include lower academic performance, legal troubles, and substance abuse issues. *Id.* at p. 15:12–18.

61.     Because of his review of text messages between the Moodys, Dr. Flens formed an opinion that Ms. Moody's "attitudes and behaviors . . . are interfering with or preventing Ed Moody from having involvement in the child's life and contact with the child." *Id.* at p. 14:8–12.

62.     Specifically, Dr. Flens identified instances where Ed Moody made "numerous contacts or texts with [Ms. Moody] in an attempt" to have contact with their minor child, and, in response, Ms. Moody would either ignore his request, respond "snarkily," or used the contact to attack [Ed Moody] on his substance abuse or other issues." *Id.* at p. 15:19–16:7.

63.     In his review of the text messages, Dr. Flens also identified instances where Mr. Moody was non-responsive to requests regarding visitation from Ms. Moody. *Id.* at p. 25:16–22.

64.     He also found that the text messages contained "some positive stuff," including "some responsive stuff by [Ms. Moody.]" *Id.* at pp. 26:1–2.

65.     Dr. Flens concluded that the pattern of communication between the Moodys "g[ave] a pretty clear" picture of a "high conflict case" of co-parenting "where the[ Moodys] are just not able to" co-parent effectively. *Id.* at p. 16:4–7.

66.    In sum, Dr. Flens concluded that "there are issues about the mother" and "there[are] issues about the father" that should be evaluated by a forensic psychologist because "those [issues] would, ultimately, impact parenting and co-parenting." *Id.* at pp. 10:17–11:5.

67.    Because the issues Dr. Flens identified would "not only effect their ability to co-parent but [would also] certainly effect their ability to parent [the Moodys' minor child,]" Dr. Flens "would think that" a child custody evaluation "would be very helpful to the Court" in addressing custody in the divorce proceedings. *Id.* at pp. 10:17–11:14.

68.    If Dr. Flens had not come to an opinion that a custody evaluation would be helpful, Dr. Flens "would have let [Ed Moody and his counsel] know . . . ." *Id.* at pp. 18:14–19:2.

69.    Had the circuit court ordered a custody evaluation, Dr. Flens believed that it should be focused on the issues raised in his report to the extent that those issues affect Ms. Moody and Ed Moody's parenting and coparenting. *Id.* at p. 46:15–22.

70.    After he came to an opinion, Dr. Flens was "asked to put [his opinion] in the form or a report." *Id.* at p. 19:3–5.

71.    Dr. Flens was open to providing his testimony so that the judge could assess his credibility in person. *Id.* at p. 27:13–23.

72.    In preparing his report, Dr. Flens did not assess the credibility of the factual allegations made by either Ms. Moody or Ed Moody. Instead, he took information included in the records at face value. *Id.* at pp. 29:25–30:4.

73.    He did not conduct any independent investigation to determine whether the material or allegations contained in the records were in fact true. *Id.* at p. 30:5–7.

74.    The records included motions, responses, and replies filed by both Ms. Moody and Ed Moody. Exhibit I, pp. 10–15.

75.     Dr. Flens took the records at face value regardless of whether the records were produced by counsel for Ms. Moody or counsel for Ed Moody. Exhibit M, p. 34:4–10.

76.     Many of the documents that Dr. Flens reviewed "had been filed with the Court," and, in some cases the documents had attached exhibits. *Id.* at p. 47:17–18.

77.     The documents also included "testimony in sword depositions and hearings" and court orders. *Id.* at p. 47:18–21.

78.     The documents provided by Ed Moody's counsel were the basis of Dr. Flens opinions regarding both Ms. Moody and Ed Moody. *Id.* at p. 48:4–9.

79.     Dr. Flens's opinion that a forensic psychological evaluation would be beneficial in the divorce proceeding was not based on a personal interaction with either party, and he did not evaluate either Ms. Moody or Ed Moody or their minor child. *Id.* p. 38:3–10.

80.     The Circuit Court did not adopt any of Dr. Flens recommendations. Exhibit J, p. 19:14–16.

81.     Neither Ms. Moody nor Ed Moody were evaluated by a forensic psychologist. *Id.* at p. 19:17–19.

82.     Dr. Flens's report may never have been entered into the record during the divorce proceedings. *Id.* at p. 19:20–25.

83.     Dr. Flens sat for a deposition, but he did not testify at a hearing in the divorce proceedings. *Id.* at p. 20:1–5.

D.     Angela Moody's Complaints Regarding Dr. Flens's Report

84.     Ms. Moody disagrees with "some of the examples that" Dr. Flens used as to support the first, second, and fourth issues identified by Dr. Flens. Those issues are concerns about Ms. Moody's credibility, honesty, and characterological issues; concerns about Ms. Moody exposing

the Moodys' minor child to her romantic partner; and high conflict co-parenting and gatekeeping. *Id.* at p. 22:11–15.

85.     She also disagrees with "some of the examples that [Dr. Flens] failed to include concerning all of these issues that would have given it a more factual and fair assessment." *Id.* at p. 22:17–20.

86.     She does believe she and her ex-husband had a high-conflict coparenting relationship during the divorce. *Id.* at pp. 22:21–23:1.

87.     Ms. Moody would still label the co-parenting relationship between her and Ed Moody as high conflict. *Id.* at p. 23:10–12.

88.     The co-parenting relationship between her and Ed Moody has "stayed the same" after their divorce was finalized. *Id.* at p. 23:13–17.

89.     Regarding Dr. Flens's report, Ms. Moody "disagree[s] with" a lot of the examples used by Dr. Flens because they "are allegations . . . so [Dr. Flens] . . . wasn't aware if any of this information was proven . . . ." *Id.* at pp. 25:19–26:7.

90.     Dr. Flens using examples that were allegations made during the divorce proceedings is Ms. Moody's biggest concern with the examples included in his report. *Id.* at p. 26:8–11.

91.     Ms. Moody "would have liked [Dr. Flens] . . . to find out if there were actually rulings" made on the allegations included in the records. *Id.* at pp. 27:17–28:7

92.     She "think[s] he should have also attempted to fact check the information that was provided to him or to found out if there was a response filed or a reply filed" and to make corrections if he found that the examples he used in the report were not factually proven. *Id.* at pp. 30:20–31:12.

93.     If Dr. Flens used examples from pleadings in the contested divorce, Ms. Moody believes that Dr. Flens should have included "not just my ex-husband's allegations" but to "perhaps also include what my – what my response to the pleading may have said." *Id.* at p. 32:2–16.

94.     Ms. Moody believes that if she believed that Ed Moody had exposed their minor daughter to a romantic issue that it would have been an issue that should have been raised in the divorce proceedings. *Id.* at p. 32:17–24.

95.     She believes that if she had exposed her daughter to a romantic partner, and her romantic partner had a criminal history that was verified it would have been an issue that Dr. Flens should have included in his report. *Id.* at p. 33:17–22.

96.     Ms. Moody recognizes that Dr. Flens "included information about [Ed Moody's] alcoholism" and that Dr. Flens "was trying to appear in some way that he was not biased." *Id.* at p. 35:8–12.

97.     Ms. Moody believes that when Dr. Flens included allegations in his report that "he is implying that he believes they're facts." *Id.* at p. 37:14–21.

98.     She believes that Dr. Flens wanted his reader to believe that she had exposed her minor child to a romantic partner who was violent. *Id.* at p. 38:12–20.

99.     She admits that Dr. Flens is "saying he reviewed documents and" the examples he included in his report was "what was stated" in those documents. *Id.* at p. 39:2–9.

100.    Ms. Moody believes that once her counsel "put [Dr. Flens] on notice . . . that his report contained a lot of inaccuracies" that Dr. Flens had a duty "to withdraw his report or make corrections or clarifications . . . ." *Id.* at p. 43:1.

101.    She believes that Dr. Flens "cherry-picked" and "was selective in what he chose to put in [his] report." *Id.* at p. 43:11–17.

102.    Ms. Moody recognizes that Dr. Flens, "in his executive summary," was "making opinions about my character and integrity . . . ." *Id.* at p. 43:24–25.

103.    By including information in the record of the party's divorce and "choosing" to "rely[] on court documents" that Dr. Flens "is implying that he believes that [the information is a] fact by writing the report." *Id.* at pp. 44:18–45:1.

104.    Throughout Dr. Flens's report, Ms. Moody recognizes that Dr. Flens "say[s] things like 'this appears' . . . ." *Id.* at p. 46:1–6.

105.    She believes the report is factually incorrect because it states that Dr. Flens has reviewed documents "generated by Angela Moody," but she did not generate those documents "[her] attorneys did." *Id.* at p. 47:10–16.

106.    Ms. Moody is affected by Dr. Flens's report because her "attorney had to file a motion in limine because her ex-husband's attorneys continue to use this report . . . ." *Id.* at p. 47:17–23.

107.    She is also affected because her ex-husband has "distributed it to multiple parties" and "discussed it with [their minor child] and upset [the minor child] . . . ." *Id.* at pp. 47:24–28:1.

108.    That her ex-husband continues to attempt to use Dr. Flens's report in their divorce proceedings, has "been upsetting." *Id.* at p. 48:14.

109.    Ms. Moody believes that her "ex-husband has used [Dr. Flens's] report as a tool to continue to try and shame [her]" and that "he[ has] said horrible things about [her] throughout using [Dr. Flens's report." *Id.* at p. 48:15–19.

14

110.    The report has harmed Ms. Moody because "[i]t put extreme pressure on [her] to . . . settle [the] divorce." *Id.* at p. 48:22–23.

111.    The report has affected Ms. Moody because she has "had to spend money for – for therapy" and she "had to spend money during the divorce and post-decree hearings . . . to fight [this report].

Respectfully Submitted,

Todd Wooten (ABN 94034)
HALL BOOTH SMITH, P.C.
200 River Market Avenue, Suite 500
Little Rock, AR  72201
Telephone: 501-435-3190
Fax:  501-604-5566
Email:  *twooten@hallboothsmith.com*

*Attorneys for Defendant,*
*James R. Flens, Ph.D.*

## CERTIFICATE OF SERVICE

I, Todd Wooten, do hereby certify that on March 9, 2023, I served a copy of the foregoing pleading with the Court via the CM/EFC system which will send notification of such filing to all counsel of record.

Todd Wooten